**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| NATASHA CAMPBELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-09-861 |
| | § | |
| I.C. SYSTEM, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER
ON PLAINTIFF'S MOTION FOR ATTORNEY'S FEES**

On July 6, 2009, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636(c). (Docket Entry #9). On October 7, 2010, the court entered an order of dismissal, after notification from the parties that they had reached an amicable settlement. (Docket Entry #63). Pending before the court is an application for attorney's fees that was filed by Plaintiff Natasha Campbell ("Plaintiff," "Campbell"). (Plaintiff's Application for Attorney's Fees and Memorandum of Law in Support Thereof ["Motion"], Docket Entry #66). Defendant I.C. System, Inc. ("Defendant," "ICS") has responded in opposition to the motion, and Plaintiff has replied. (Defendant I.C. System, Inc.'s Response to Plaintiff's Application for Attorney's Fees ["Response"], Docket Entry #67; Plaintiff's Reply to Defendant's Response to Plaintiff's Application for Attorney's Fees ["Reply"], Docket Entry #68). After considering the arguments of the parties, the evidence submitted, and the applicable law, it is ORDERED that Plaintiff's application for attorney's fees is GRANTED, in part.

**Background**

This case concerns the efforts by I.C. System, Inc., a debt collection company, to collect $200 that Natasha Campbell owed to the Target Corporation ("Target"). (Memorandum and Order on Motions for Summary Judgment ["Memorandum on Summary Judgment"], Docket Entry #59, at 2). In 2007, Campbell became a Target credit card holder. (*Id*.). She became pregnant in the Spring of 2008, and, at that time, she paid off about half of her Target credit card debt, leaving her with a balance of $200. (*Id*.). Unfortunately, her pregnancy was a complicated one, and she was ordered to bed rest "in the last months of the pregnancy." (*Id*.). As a result, Campbell stopped working, which caused financial difficulty for her family. (*Id*.). Her family included her common-law husband, Jose Toro ("Toro"), and their three-year-old daughter. (*Id*. at 2-3). Campbell's second child was born, prematurely, in September 2008. (*Id*. at 3). At birth, the baby suffered from breathing problems, and the doctors were concerned that she had suffered brain damage. (*Id*.). As a result, the baby stayed in a neonatal intensive care unit of the hospital until January 2009, when doctors allowed her to go home. (*Id*.). Plaintiff contends that these circumstances "placed undue financial hardships on her family [so that she] was unable to pay her Target account." (*Id*.).

During this period, Target assigned Campbell's delinquent account to ICS for collection. (*Id*.). ICS had contracted with Target to recover payment of store credit card debts that had been delinquent for less than 180 days. (*Id*.). Plaintiff's account was assigned to the ICS office in St. Paul, Minnesota, which employed forty-five "debt collectors" and three supervisors. (*Id*.). The St. Paul office also utilized an "automated dialer system" that was programmed to dial a debtor's phone number a specified number of times each day. (*Id*.). That system was allegedly triggered to "make at least 4-5 collection calls" to each debtor daily. (*Id*.). ICS offered financial incentives to collectors

to obtain either payment, or a debtor's promise to pay the outstanding bill. (*Id*.). If the debtor answered the telephone, the call was transferred to one of the debt collectors to discuss payment options. (*Id*.). During these conversations, the collector was encouraged, but not required, to take notes. (*Id*.). The collection efforts that are relevant to Campbell's claims took place between December 2008 and January 2009. (*Id*.).

Plaintiff never disputed that she owed $200 to Target, but she insisted that, at the relevant time, she simply could not afford to pay her bill. (*Id*. at 4). She reported that ICS first called her on December 9, 2008, on her cellular phone. (*Id*.). She alleged that she informed the ICS representative of her circumstances, but that she was not offered any assistance or advice on how to address the delinquent bill. (*Id*.). Campbell claimed, instead, that the collection company launched a campaign of harassment that included an excessive number of phone calls. (*Id*.). She also alleged that, during telephone conversations, many of the ICS representatives were "rude," "unprofessional," "oppress[ive]," and "abus[ive]." (*Id*.). Campbell stated, for instance, that on December 10, 2008, the following took place:

> [She] received a telephone call from one of the Defendant's representatives while she was on her way to the hospital for an MRI on her daughter's brain. The Defendant's representative made a demand for payment of the account. Ms. Campbell told the representative about her daughter's condition and how it had caused her the financial hardships that led to her inability to pay Target. Ms. Campbell told the representative that she was on her way to her daughter's MRI, but despite this she received multiple telephone calls that day from the Defendant's representatives. In the evening Ms. Campbell returned the calls of the Defendant and spoke with a representative. She told the representative that she had received multiple previous calls that day and asked that ICS stop calling her about the account repeatedly. In response, ICS['s] representative told Ms. Campbell "we can call you as many times as we want." A woman named Michelle [Loughery] who purported to be the representative's supervisor then got on the telephone and began speaking to Ms. Campbell in a rude and unprofessional manner. She accused Ms. Campbell of "harassment to Target" by failing to pay the bill. When Ms. Campbell tried to explain that her troubled

> pregnancy and premature delivery had caused financial problems, the Manager stated "so you have a baby and can't pay your bills? Come on Ma'am!"
>
> . . . Ms. Campbell's husband who was riding in the passenger seat and could tell that his wife was being upset by the caller, begin speaking in the background. The Defendant's representative told Ms. Campbell "If your husband has so much to say, why don't you put him on the phone! You put him on!" This purported manager also asked Ms. Campbell in a sarcastic and abusive tone "Well if your child is in the hospital, why aren't you there?" Throughout the conversation, the representative referred to Ms. Campbell as "you people." Ms. Campbell asked the manager for the name and phone number of the Compliance Officer of the company. The manager stated "I will never give you the Compliance Office, and if you get it, they will just ask you to pay your bill."

(*Id*. at 4-5). Plaintiff claimed that she has since learned that "Michelle" was not a supervisor, as represented, and that it was not true that the Compliance Office would not have assisted her. (*Id*. at 5). Campbell also claimed that, on December 22, 2008, she "received another collection call from the Defendant and a message on her voicemail," and the following day, "Defendant telephoned and spoke with [her] multiple times throughout the afternoon and evening." (*Id*.). Campbell further alleged that, on January 5, 2009, the following occurred:

> [T]he Defendant called Ms. Campbell again. That afternoon Ms. Campbell returned the Defendant's call and in the telephone discussion informed the representative that she could not pay the account at that time. The representative immediately hung up on Ms. Campbell. Later that evening an ICS representative named "Bobby [Kersh]" called Ms. Campbell. Ms. Campbell again stated that she was not in a position to pay the account. The Defendant's representative told Ms. Campbell "what would you do if someone took your money and did not pay you back?—who would you call?" This representative made other comments such as "you better pay or else" and "I am not an attorney and I can't give you legal advice, but if you can't pay you better get an attorney."

(*Id*.). She stated that later, on the same evening,

> . . . Defendant called Ms. Campbell again and the representative told Ms. Campbell that she only had a few weeks left to pay before the account would "go to the next step."

4

(*Id*.). Plaintiff alleged that ICS "made at least 19 telephone calls to [her] cell phone number from its automated dialer system" between December 9, 2008, and January 12, 2009. (*Id*.). She insisted, however, that she never gave ICS permission to use her cell phone number for debt collection calls. (*Id*.). She claimed, as well, that, once the phone calls began, and she informed ICS that the number belonged to her cell phone, the calls did not cease. (*Id*.). Campbell also complained that ICS debt collectors called her directly, in addition to utilizing the automated dialer system. (*Id*. at 5-6). She alleged that, as a result of Defendant's conduct, she suffered actual damages in the form of mental anguish and loss of consortium. (*Id*. at 6).

On March 24, 2009, Plaintiff filed this lawsuit, complaining that Defendant's conduct violated the following statutes: (i) the federal Fair Debt Collection Practices Act ("FDCPA"), codified at 15 U.S.C. §§ 1692 *et seq*.; (ii) the Texas Debt Collection Practices Act, set out in §§ 392.001 *et seq*. of the Texas Finance Code; and (iii) the Texas Deceptive Trade Practices Act, located in chapter 17 of the Texas Business & Commerce Code. (*Id*.). On April 15, 2010, Plaintiff filed her Second Amended Complaint, in which she added a claim under § 1692e(10) of the FDCPA, and under the federal Telephone Consumer Protection Act ["TCPA"], codified at 47 U.S.C. § 227. (*Id*.). On May 17, 2010, ICS filed a motion to dismiss the Second Amended Complaint, which the court converted to a motion for summary judgment. (*Id*.). In a supplemental brief, ICS sought summary judgment on all of Plaintiff's causes of action. (*Id*.). On May 18, 2010, Campbell filed a motion seeking judgment as a matter of law on her claims under the TCPA. (*Id*.). On September 3, 2010, the court denied Plaintiff's summary judgment motion, and granted Defendant's motion in part. (*Id*. at 20). The court found that genuine issues of material fact remained on Campbell's claims that ICS's conduct was unlawfully annoying, harassing, or abusive, as well as her claim that

it violated the law by using her cell phone number without her permission. (*Id*. at 19). On October 7, 2010, the parties informed the court that they had entered into a settlement agreement, and the court entered a conditional order of dismissal. (Docket Entries #62, #63). As part of the settlement terms, ICS agreed to pay Campbell the sum of $7,000.00 in damages and $5,654.00 for expenses incurred in litigation. (Motion at 2; Response at 2). The parties did not resolve the issue of attorney's fees, deciding instead to submit the matter to the court. (*Id*.).

On October 13, 2010, Plaintiff filed her application for an award of attorney's fees in the sum of $93,965.50. (Motion at 1). Defendant filed a response in which it does not oppose an award of fees, but objects to the requested amount as unwarranted and excessive. (Response at 1-4, 31). Having reviewed the pleadings, the evidence submitted, and the applicable law, the court finds that Plaintiff's motion should be granted, in part, and that Plaintiff should be awarded the sum of $48,204.30 in attorney's fees.

**Discussion**

In her motion, Plaintiff seeks attorney's fees under the Fair Debt Collection Practices Act in the amount of $93,965.50. (Motion at 1). Defendant does not challenge Plaintiff's right to an award of attorney's fees. (Response at 31). Defendant does, however, argue that the amount Campbell seeks is excessive, and it offers three suggestions on a "reasonable" fee award. (*Id*.). Defendant first contends that Campbell's attorney's fees should be limited to $10,111.50, which represents its own calculation of her fees through the parties' mediation in November 2009. (*Id*. at 7). As an alternative, Defendant argues that $21,000 is a reasonable sum, because that is three times the amount that Plaintiff accepted as damages in the settlement. (*Id*. at 9). Defendant's final

suggestion is that Campbell be awarded no more than $39,199.63, a figure derived from a detailed evaluation of Plaintiff's application. (*Id*. at 9-31).

The FDCPA allows for an award of "reasonable" attorney's fees "in the case of any successful action to enforce the foregoing liability."[1] 15 U.S.C. § 1692k(a)(3); *see Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, ___ U.S. ___, 130 S. Ct. 1605, 1609 (2010); *Johnson v. Eaton*, 80 F.3d 148, 150-51 (5th Cir. 1996). To determine a "reasonable fee," a court begins by looking at "the compensable hours from the attorneys' time records, including only hours reasonably spent." *Shipes v. Trinity Indus*., 987 F.2d 311, 319 (5th Cir. 1993). The court can reduce the reported number of compensable hours "[w]here the documentation of hours is inadequate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The court can exclude those hours it finds to be "excessive, redundant, or otherwise unnecessary." *Id*. at 434. The next step the court must take is to "select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases." *Shipes*, 987 F.2d at 319; *see Perdue v. Kenny A.*, ___ U.S. ___, 130 S. Ct. 1662, 1672-73 (2010) (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The court then multiplies the number of compensable hours by that hourly rate "to produce the 'lodestar' amount.'" *Id*.; *see Rutherford v. Harris County*, 197 F.3d 173, 192 (5th Cir. 1999) (citing *League of United Latin Am. Citizens # 4552 v. Roscoe Indep. Sch. Dist*., 119 F.3d 1228, 1232 (5th Cir. 1997)). Once it has calculated the lodestar amount, the court considers the applicable factors listed in *Johnson v. Georgia Highway Express, Inc*., in order to determine whether the lodestar should be adjusted. *See Shipes*, 987 F.2d at 320 (citing *Johnson*, 488 F.2d 714 (5th Cir. 1974)). Finally, a court must provide a clear and concise explanation for any amount it decides to award. *See Small v. Richard*

---

[1] There is no dispute that Plaintiff prevailed in this lawsuit.

*Wolf Med. Instruments Corp.*, 264 F.3d 702, 708 (7th Cir. 2001). It may not simply "'eyeball'" the requested fee and opt to award a lower fee simply because "of a visceral reaction that the request is excessive." *Id.* Overall, however, the determination of a "reasonable attorney's fee" is left to the judge's discretion. *See Jerman*, 130 S. Ct. at 1621; *Turner v. Oxford Mgmt. Servs., Inc.*, 552 F. Supp. 2d 648, 650 (S.D. Tex. 2008) (Atlas, J.).

### *Compensable Hours*

The first step in calculating a reasonable attorney's fee is to "determine the compensable hours from the attorneys' time records, including only hours reasonably spent." *Shipes*, 987 F.2d at 319. In this case, Plaintiff's attorney, Matthew Probus ("Mr. Probus") claims that his law firm spent 286.20 hours on this case, through the filing of his fee application. (Motion at 6-7). He states that this figure does not include the hours "spent working on matters involving the federal Telephone Consumer Protection Act . . ., because that statute does not allow a successful litigant to recover attorney's fees." (*Id.*). Mr. Probus states that 47 of those hours were spent "preparing pleadings and attending necessary conferences before this Court"; that 2 hours were spent "communicating with the Plaintiff and discussing the status and ongoing strategies of the case"; that .4 hours were spend on "general matters," such as preparing the file, keeping the calendar, and recording witness statements; that 111.2 hours were spent on discovery; that 81 hours were devoted to "drafting responses to two motions to dismiss and two motions for summary judgment"; that 22.4 hours were spent on settlement negotiations; that 6.6 hours were used for other settlement-related matters, such as preparing the necessary documentation, client conferences, and preparing the motion to seal the

fee application documents; and 14.4 hours were spent "preparing this fee application."[2] (*Id.* at 7-19). Mr. Probus supports these figures by his own affidavit and his firm's billing records. (*Id.* at Exhibit ["Ex."] A, A-2, A-3). The billing records are very detailed about the work performed for each period billed. *See Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993) (holding that "[t]he party seeking attorneys' fees must present adequately documented time records to the court"). All of the hours appear to have been "reasonably expended on the litigation." *Hensley*, 461 U.S. at 435. Here, the court concludes that the 285 hours claimed are compensable as "hours reasonably spent." *See Shipes*, 987 F.2d at 319.

Defendant argues, however, that "Plaintiff's attorney's fees should be cut off from mediation," referring to the parties' unsuccessful mediation on November 10, 2009. (Response at 7-8). It reasons that, at mediation, it offered to settle the case for $10,000, and Plaintiff refused, only to ultimately agree to settle for a lesser amount. (*Id.*). It also points out that, at the time, Plaintiff had incurred only a fraction of the fees she is now claiming. (*Id.*). However, Defendant cites no authority to support this argument. As Plaintiff points out, Defendant's contention suggests Rule 68 of the Federal Rules of Civil Procedure, which allows a defendant to make an "offer of judgment" before a case goes to trial. (Reply at 2-7). Under that rule, if the plaintiff declines the offer and then ultimately obtains a judgment for less than the offered amount, "the offeree must pay the costs incurred after the offer was made." FED. R. CIV. P. 68(d); *see Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 333 (5th Cir. 1995). In this case, Defendant made no "offer of judgment." (Reply at 3). In addition, neither party cites authority for the proposition that, in FDCPA cases, the

---

[2] Although Plaintiff claims that these hours amount to 286.2 hours, in fact, they add up to 285 hours. As Defendant points out, this miscalculation appears to be the result of Plaintiff's failure to subtract 1.2 hours of paralegal work involving the TCPA. (Response at 13).

word "costs," as used in Rule 68, should be read to include attorney's fees, and the law is not settled on this issue. *See Marek v. Chesny*, 473 U.S. 1, 7-9 (1985) (the word "costs" in Rule 68 encompassed attorney's fees in a § 1988 action because § 1988 included "fees" within the meaning of "costs"); *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1099 (9th Cir. 2006) (holding that the word "costs" in Rule 68 did not include attorney's fees in a case involving breach of contract and tort); *Utility Automation 2000, Inc. v. Choctawhatchee Elec. Co-op, Inc.*, 298 F.3d 1238, 1245 n.6 (11th Cir. 2002) (same); *Fletcher v. City of Fort Wayne, Ind.*, 162 F.3d 975, 977 (7th Cir. 1998) (holding that the word "costs" did not include attorney's fees in a § 1988 case); *Ortiz v. Regan*, 980 F.2d 138, 141 (2d Cir. 1992) (holding that the word "costs" in a § 1988 case did encompass attorney's fees). In this case, there is no authority cited in support of Defendant's claim that Plaintiff is not entitled to fees for any work after the November 2009 mediation. The court finds this argument to be without merit.

### *Appropriate Hourly Rate*

"As a second step, the district court must select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases." *Shipes*, 987 F.2d at 319; *see Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 783-84 (S.D. Tex. 2007) (Hittner, J.). In this case, Mr. Probus states that his hourly rate is $350 an hour, $150 an hour for firm associates, and $95 an hour for the work performed by paralegals. (Motion at 20-21). In his affidavit, Mr. Probus states that "[t]hese rates are the usual and customary hourly billing rates for attorneys in the Southern District of Texas with the experience and qualifications of these attorneys in similar matters." (*Id.* at Ex. A-1, 8). He also directs the court to other FDCPA cases that he has handled in this district, for which he was awarded fees at an hourly rate of $350. (*Id.* at 21-22 n.9

[citing, *e.g.*, *Tabibian v. Katz, P.A.*, Civil Action No. 4:09-cv-2008 (S.D. Tex. Nov. 4, 2010) (Harmon, J.); *Jackson v. Credit Collection Servs. Group, Inc.*, Civil Action No. 4:08-cv-1593 (S.D. Tex. Oct. 29, 2008) (Ellison, J.); *Smith v. United Auto Credit Corp.*, Civil Action No. 4:06-cv-2586 (S.D. Tex. Feb. 26, 2008) (Harmon, J.)]).  As ICS points out, in most of those cases, the defendant did not challenge the $350 per hour rate.  (Response at 13-14).  Nonetheless, the fact that the court permitted an award based on that rate is evidence of what is "usual and customary."  *See American Home Assur. Co. v. United Space Alliance, LLC*, 378 F.3d 482, 492-93 (5th Cir. 2004); *Edmond v. Oxlite Inc.*, 2005 WL 2458235, at *7 (W.D. La. 2005); *Ruiz v. Estelle*, 553 F. Supp. 567, 595-96 (D.C. Tex. 1982).  Defendant also cites two similar cases in which an attorney was awarded an hourly rate of no more than $300.  (*Id*. at 15 [citing *Memon v. Pinnacle Credit Servs. LLC*, Civil Action No. 07-cv-3533 (S.D. Tex. May 21, 2009) (Ellison, J.); *Hetherington v. Allied Int'l Credit Corp.*, Civil Action No. 4:07-cv-2104 (S.D. Tex. Jan. 26, 2009) (Johnson, J.)]).  In particular, Defendant cites *Hetherington* to show that Mr. Probus believes, in fact, that $300 per hour is a reasonable rate for his work in similar cases.  (*Id*.).  However, in *Hetherington*, Mr. Probus actually stated that his "hourly billing rate for matters of this nature and complexity is $350 per hour."  *See Hetherington*, Civil Action No. 4:07-cv-2104, Docket Entry #76-1, at 6.  In light of this, and in the absence of significant evidence to the contrary, the court finds that $350 per hour is the usual and customary rate for attorneys of Mr. Probus's qualifications and experience in fair debt collection cases.  Because Defendant offers no evidence to contradict Mr. Probus's affidavit testimony that $150 is the usual and customary fee for associate attorneys in similar cases, and $95 is a typical hourly rate for a paralegal, the court finds that Plaintiff has met her burden of proof on the issue of an appropriate hourly rate.  *See Hensley*, 461 U.S. at 437.

11

*Lodestar*

Having found that Plaintiff has established the number of compensable hours and an appropriate hourly rate, the court must calculate the lodestar amount. *See Shipes*, 987 F.2d at 319. To do so, the court multiplies "[t]he number of compensable hours . . . by the selected hourly rate." *Id*. In this case, because the court has accepted Plaintiff's calculations up to this point, the lodestar amount is $93,965.50. (*See* Motion at 1).

It is well settled that the lodestar amount is "presumptively reasonable and should be modified only in exceptional cases." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992); *accord Saizan v. Delta Concrete Prods. Co*., 448 F.3d 795, 800 (5th Cir. 2006) (citing *Heidtman v. County of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999)); *Turner*, 531 F. Supp. 2d at 650. Once the lodestar is calculated, the court "may decrease or enhance the amount based on the relative weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*" *Saizan*, 448 F.3d at 800 (citing *Johnson v. Georgia Highway Exp., Inc*., 488 F.2d 714, 717-19 (5th Cir. 1974)). These factors include the following:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to this case; (5) the customary fee; (6) whether fee is fixed or contingent; (7) time limitations; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Shipes*, 987 F.2d at 319-20 n.6 (citing *Johnson*, 488 F.2d at 717-19); *accord Saizan*, 448 F.3d at 800 n.18. "'[O]f the *Johnson* factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel.'" *Id*. at 800 (quoting *Migis v. Pearle Vision, Inc*., 135 F.3d 1041, 1047 (5th Cir.

1998)); *see Watkins*, 531 F. Supp. 2d at 784. On the other hand, "[t]he lodestar may not be adjusted due to a *Johnson* factor, . . . if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting." *Saizan*, 448 F.3d at 800 (citing *Migis*, 135 F.3d at 1047); *accord Watkins*, 531 F. Supp. 2d at 784.

The first of the *Johnson* factors concerns the amount of "time and labor involved" in prosecuting this case. *See Shipes*, 987 F.2d at 319-20 n.6 (citing *Johnson*, 488 F.2d at 717-19). In the application for attorney's fees, Mr. Probus represents that he is not "includ[ing] in this amount time spent working on matters involving the federal Telephone Consumer Protection Act . . ., because that statute does not allow a successful litigant to recover attorney's fees." (Motion at 6-7). He also states, however, that he "has included a description of this work so that the Court can see it." (*Id*. at 7). Unfortunately, Plaintiff has not made clear how many hours he spent on the TCPA claim as opposed to the other claims. In the motion, Mr. Probus states, for example, that, in drafting the Second Amended Complaint, twenty-five percent of his time was spent on the TCPA claims. (*Id*. at 9). But a comparison of that pleading to the First Amended Complaint reveals very few changes, aside from the addition of the TCPA allegation. Similarly, it is unclear how much time was spent on non-TCPA matters in drafting dispositive motions and responses. In fact, Campbell's motion for partial summary judgment concerned only her claims under the TCPA. The court can reduce the lodestar amount when a party fails to submit billing records that are sufficiently clear to allow the court to decipher whether the hours billed are reasonably compensable. *See Saizan*, 448 F.3d at 800. In *Saizan*, the Fifth Circuit approved a ten percent reduction in the lodestar amount for such a "failure to provide evidence of billing judgment." *Id*. This court will likewise reduce the lodestar by ten percent, resulting in a lodestar amount of $84,568.95.

Other *Johnson* factors include "the novelty and difficulty of the questions"; "the skill requisite to perform the legal services properly"; and "the experience, reputation, and ability of counsel." *Shipes*, 987 F.2d at 319-20 n.6 (citing *Johnson*, 488 F.2d at 717-19). In this case, the parties agree that Mr. Probus has significant expertise in the areas of law involved in this litigation. (Motion at Ex. A; Response at 28). Also, as Mr. Probus has stated, the issues in this lawsuit "were moderately novel and difficult," as "[an] attorney prosecuting the case like this one must have an overall knowledge of the FDCPA and its interplay with other consumer statutes affecting the collection of debts," as well an understanding of the debt collection industry. (Motion at 19). As Judge Stacy stated in *Tabibian*, however, "the factual and legal issues for Plaintiff's individual claims [in this type of case] were not overly difficult o[r] unusual . . . in light of counsel's expertise in the area of consumer law and debt collection practices." *See Tabibian*, Civil Action No. 4:09-cv-2008, at Docket Entry #65. Nothing here suggests that the lodestar amount should be adjusted upward because of Mr. Probus's skill or the difficulty of the questions posed by this case. On the other hand, the *Johnson* factor involving "the skill requisite to perform the legal services properly" raises the issue of whether it was reasonable that an attorney with Mr. Probus's experience perform all but 20 of the 285 hours billed in this case. (*See* Motion at 7; Response at 16-19). A review of the billing records shows that many of the tasks performed by Mr. Probus, including calendaring court dates, filing, factual investigations, compiling discovery responses, and more, could have easily been performed by an associate attorney or, in many cases, a paralegal, both of which Mr. Probus had on staff. The "dollar value" of legal work is not enhanced just because a high-level attorney performs it, as opposed to an equally capable associate or paralegal. *See Johnson*, 488 F.2d at 717. In this case, then, while Campbell benefitted by having an attorney with Mr. Probus's skill

and experience in the area of debt collection law, having him perform tasks that could easily have been performed by lower-paid staff was unnecessary. Defendant raised this issue at length in its response to the fee application, but Plaintiff made no attempt to justify the billing in this regard. As a result, the court deems it appropriate to adjust the lodestar amount by another thirty percent, for a total of $50,741.37.

The last of the relevant *Johnson* factors is a consideration of "the amount involved and results obtained." *Shipes*, 987 F.2d at 319-20 n.6 (citing *Johnson*, 488 F.2d at 717-19). Where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Saizan*, 448 F.3d at 801. This may be true "even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Id*. (citing *Migis*, 135 F.3d at 1048; *Hensley*, 461 U.S. at 436). In this case, the parties ultimately reached an agreement to settle the case for the sum of $7,000. (Motion at 2; Response at 2). An attorney's fee award of more than seven times that amount seems excessive. As a result, the court agrees with Defendant that a reduction of the lodestar amount at an additional five percent is warranted, for a total sum of $48,204.30. (*See* Response at 29-30).

In this case, the court has considered the factors in *Johnson v. Georgia Highway Express*, and determined that the lodestar amount should be decreased. *See Saizan*, 448 F.3d at 800 (citing *Johnson*, 488 F.2d at 717-19). For the reasons outlined in this memorandum, the court concludes that a reasonable award of attorney's fees in this case is $48,204.30.

**Conclusion**

Accordingly, it is **ORDERED** that Plaintiff's Application for Attorney's Fees is **GRANTED**, in part.

It is further ordered that Plaintiff be awarded the sum of $48,204.30 in attorney's fees.

The Clerk of the Court shall enter this memorandum and order and provide a true copy to all counsel of record.

**SIGNED** at Houston, Texas, this 21st day of December, 2010.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**